IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TEVITA FINAU TAFUNA,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING THE GOVERNMENT'S MOTION FOR RECONSIDERATION**<br><br>Case No. 2:19-cr-00112-JNP<br><br>Honorable Jill N. Parrish |

Before the court is the Government's motion to reconsider the court's order to suppress evidence. [Docket 47]. The court GRANTS the motion to reconsider and VACATES its prior order suppressing evidence.

## FINDINGS OF FACT

On January 25, 2019, at approximately 1:00 a.m., Tafuna was sitting in the passenger seat of a vehicle parked in the back corner of a large apartment complex. Tafuna's friend, who owned the vehicle, was seated in the driver's seat. Two other individuals were siting in the back seat. The vehicle was backed into the parking space.

Officer Jeffery Nelson pulled into the apartment complex and observed the vehicle and its occupants. Officer Nelson was suspicious of the individuals sitting in the parked vehicle because, in his experience, this indicated drug use or a stolen vehicle. But he believed that he did not have the amount of reasonable suspicion required to detain the occupants of the vehicle. Officer Nelson pulled up to the vehicle at an angle with the front of his car pointed toward the driver's side door. His "takedown" lights—bright overhead lights across the top of his vehicle—were activated. The vehicle occupied by Tafuna was not blocked in by Officer Nelson's vehicle.

Officer Nelson approached the vehicle, inquired what the occupants were doing, and asked for their names and birth dates. He noticed an open beer can in the center console at that time. Tafuna identified himself, admitted that he was on parole, and stated that he had a knife with him. Officer Nelson told the occupants of the parked vehicle he was going to run their names and returned to his vehicle. Officer Nelson did not tell the vehicle occupants that they were detained, nor did he tell them that they were free to leave.

Officer Nelson accessed Tafuna's records and discovered that he was listed as having a gang affiliation and potentially being armed and violent. Officer Nelson requested backup, which took 10 or 15 minutes to arrive. Officer Austin Schmidt was one of the officers responding to the request for back up. When he arrived, he looked up Tafuna's parole agreement, which has a "section G" clause. That clause states:

> G - Pursuant to state law [Utah Code §77-23-301], while I am on parole I am subject to search and seizure of my person, property, place of temporary or permanent residence, vehicle, or personal effects by a parole officer or by any other law enforcement officer at any time (with or without a search warrant, and with or without cause); however a law enforcement officer who is not my parole officer must either have prior approval from a parole officer or have a warrant for a search of, or seizure from, my residence.

The parole agreement also contained a standard weapons clause, stating: "I will not purchase, possess, own, use, or have under my control, any explosive, firearm, ammunition, or dangerous weapon, including archery or crossbows." Finally, the parole agreement contains a nonstandard special condition prohibiting alcohol. It states: "Do not use, possess, consume, or have access to alcoholic beverages."

Officer Nelson returned to the parked vehicle and asked Tafuna to exit. Officer Nelson conducted a pat down and discovered a pocketknife. Tafuna stated that he used the pocketknife to open boxes at his job. Officer Nelson then searched the vehicle and discovered a firearm

2

underneath the passenger seat. At that point, the officers arrested all of the occupants of the vehicle. Officer Nelson notified Tafuna of his *Miranda* rights and interviewed him at the scene. Tafuna admitted to possession of the firearm.

**CONCLUSIONS OF LAW**

I.  STANDING TO CHALLENGE THE VEHICLE SEARCH

Tafuna originally moved to suppress the firearm and his confession on two grounds. First, he argued that Officer Nelson violated his Fourth Amendment rights by detaining him without reasonable suspicion of criminal activity by shining his takedown lights at the vehicle he occupied and then approaching on foot. Second, he asserted that Officer Nelson violated his Fourth Amendment rights by searching the vehicle without probable cause. The court did not address Tafuna's first argument because it determined that Tafuna's parole agreement did not authorize the search of his friend's vehicle without probable cause. The court, therefore, issued an order to exclude the firearm and the confession. [Docket 44].

The Government then moved for reconsideration, raising for the first time the issue of Tafuna's standing to challenge the vehicle search. [Docket 47]. The Government waived the issue of standing in the original motion to suppress by not raising it. *See United States v. Dewitt*, 946 F.2d 1497, 1499 (10th Cir. 1991) (holding that the Government waived the issue of standing by failing to raise it before the district court). But because the court has agreed to hear the Government's motion for reconsideration, the court now addresses the issue of standing. *See United States v. Huff*, 782 F.3d 1221, 1222 (10th Cir. 2015) ("[D]istrict court[s] may reconsider a motion to suppress without

requiring the government to justify why it initially failed to set forth that legal basis for the seizure of evidence.").

The Government now argues that Tafuna lacks standing to challenge the vehicle search because he did not own or have a possessory interest in the vehicle. "Fourth Amendment rights are personal, and, therefore, 'a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises.'" *United States v. Mosley*, 743 F.3d 1317, 1322 (10th Cir. 2014) (citation omitted). "As such, 'without a possessory or property interest in the vehicle searched, "passengers lack standing to challenge vehicle searches."'" *Id.* (citation omitted). A person who lacks standing to challenge a vehicle search, however, "may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the defendant's illegal detention." *Id.* at 1322–23 (citation omitted). "To suppress evidence as the fruit of his unlawful detention, a defendant must show, first, that he was seized in violation of his Fourth Amendment rights and, second, that 'a factual nexus' exists between his unlawful seizure and detention and the challenged evidence." *Id.* at 1323 (citation omitted).

Tafuna concedes that he did not have a possessory interest in the vehicle and that he does not have standing to challenge the search. Thus, the firearm and confession evidence cannot be suppressed based upon the unconstitutional search. Tafuna argues instead that he was unconstitutionally detained by officer Nelson and that his detention led to the discovery of the firearm and his confession. The Government argues that

4

Tafuna was not detained until the firearm was discovered. Alternatively, it argues that any detention was supported by reasonable suspicion and was, therefore, constitutional.

## II. UNCONSTITUTIONAL DETENTION

Tafuna argues that he was unconstitutionally detained beginning at three different points in his encounter with the police officers. First, Tafuna contends that Officer Nelson unconstitutionally detained him by shining his police vehicle's takedown lights at the vehicle in which Tafuna was sitting and then approaching the vehicle by foot. Second, Tafuna asserts that Officer Nelson unconstitutionally detained him by asking for his name and birthdate and then announcing that he was returning to his police vehicle to run his name in a law enforcement database. Third, Tafuna argues that he was unconstitutionally detained after Officer Nelson conducted a pat down and discovered that he was only carrying a pocketknife. The court will address each of these three time periods in turn.

### A. *The Initial Encounter*

The Fourth Amendment to the United Sates Constitution prohibits unreasonable seizures of individuals. Consensual encounters with police officers do not implicate the Fourth Amendment because the individual has not been seized. *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). The Government argues that when Officer Nelson approached the vehicle occupied by Tafuna and questioned him, he was engaging in a consensual encounter. But Tafuna contends that he had been seized without reasonable suspicion. Thus, the court must first determine whether Officer Nelson seized Tafuna from the very outset of their interaction.

5

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). In determining whether a show of authority has effectuated a seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citation omitted). This test "turns on the totality of the circumstances presented." *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (citation omitted). A non-exhaustive list of factors that a court may consider include:

> the location of the encounter . . . ; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Id*.

Thus, the key question in this case is whether a reasonable person in Tafuna's shoes would have felt free to leave or to otherwise terminate his encounter with Officer Nelson. Tenth Circuit and Supreme Court caselaw provides some guidance on this question. The Tenth Circuit has held, for example, that an officer does not seize an individual sitting in a parked vehicle by merely approaching and questioning the individual. *United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012) *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few

6

questions."). Moreover, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). Thus, asking for names and birthdates does not necessarily effectuate a seizure. Finally, Officer Nelson did not park his police vehicle in a way that would impede Tafuna's vehicle from pulling out if the driver so desired. Nor did Officer Nelson approach the parked vehicle on foot in a way that would block the vehicle's exit. Accordingly, there was no physical restraint on the vehicle occupants' freedom of movement.

Tafuna, therefore, focuses on Officer Nelson's activation of his takedown lights— bright lights arranged across the top of a police vehicle designed to illuminate the area in front of the vehicle—to argue that he had been seized. Tafuna contends that the activation of these lights constituted a show of force that would cause a reasonable person to believe that they were not free to leave.

Although not mandatory authority, the concurring and dissenting opinions in *United States v. Roberson*, 864 F.3d 1118 (10th Cir. 2017) are persuasive authority on the issue of whether the use of takedown lights effectuated a seizure of Tafuna. In *Roberson*, police officers in four vehicles converged on the parking lot of a pool hall that was known for high levels of criminal activity. *Id.* at 1119. Two officers in one of the police vehicles noticed that two individuals were seated in a vehicle that was backed into a parking space. *Id.* The officers parked about 15 feet away and "shined spotlights and bright takedown lights on the car." *Id.* The officers then approached the parked vehicle on foot. *Id.* Although the police vehicle did not block in the parked vehicle, the officers' line of approach blocked the exit of the vehicle because it could not pull out

7

without striking the officers. *Id.* at 1119–20. The officers saw that the individual seated in the driver's seat began to make stuffing motions. *Id.* at 1120. The officers ordered the vehicle occupants to show their hands, but the driver continued to make stuffing motions and only complied after multiple commands. *Id.* The officers smelled marijuana, searched the vehicle, and discovered a firearm. *Id.* The driver moved to suppress the firearm evidence, arguing that he had been unconstitutionally seized, but the district court denied the motion. *Id.* at 1120–21.

A majority of the reviewing Tenth Circuit panel upheld the district court's denial of the motion to suppress, holding that the individual seated in the vehicle did not submit to any show of authority that may have amounted to a seizure of the individual. *Id.* at 1126. In a concurring opinion, Judge Hartz addressed a question that the majority opinion avoided—whether the officer's actions effectuated a seizure of the individuals seated in the parked vehicle. Judge Hartz opined that "[t]he use of a floodlight to illuminate the vehicle, as opposed to turning on emergency lights, . . . was not coercive." *Id.* at 1133–34. In doing so, Judge Hartz relied upon opinions from the Seventh, Eighth, and Ninth Circuits. *See United States v. Clements*, 522 F.3d 790, 792, 794–95 (7th Cir. 2008) (holding that no seizure occurred where "officers shined a spotlight on the [parked] Oldsmobile[,] . . . activated their flashing red and blue lights," and shined flashlights at the vehicle as they approached); *United States v. Mabery*, 686 F.3d 591, 597 (8th Cir. 2012) "[T]he act of shining a spotlight on [the defendant's] vehicle from the street was certainly no more intrusive (and arguably less so) than knocking on the vehicle's window" and did not constitute a seizure.); *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007) (shining a flashlight into the interior of a parked vehicle

did not effectuate a seizure of the occupant). Judge Hartz further concluded that the officer's approach on foot, which temporarily blocked in the parked vehicle, was not coercive and that the driver's Fourth Amendment rights had not been violated because he had not been seized. *Roberson*, 864 F.3d at 1134.

Judge Moritz, on the other hand, authored a dissenting opinion in which she concluded that the driver had been seized through a show of authority. Notably, Judge Moritz reasoned that the district court's statement that the driver was unaware of the other three police vehicles that had converged on the parking lot was a legal conclusion rather than a finding of fact entitled to deference on appeal. *Id.* at 1136. Thus, Judge Moritz found that the combination of three factors amounted to a seizure of the driver: (1) the officers trained both a spotlight and takedown lights through the parked vehicle's windshield, (2) the officers' approach on foot blocked the vehicle's exit, and (3) the use of a "wolf-pack" technique whereby four police vehicles entered the parking lot simultaneously from separate entrances. *Id.* at 1135–36. Judge Moritz, however, indicated that the use of spotlights and takedown lights alone, without the other two factors, may not have been sufficient to effectuate a seizure through a show of force:

> *I don't dispute that other circuits have concluded "that shining a light into a vehicle does not transform a consensual encounter into a seizure."* But the show-of-authority analysis requires us to consider "the coercive effect of police conduct, taken as a whole"— not in bits and pieces. Thus, rather than sift through cases that each address only one or two of the circumstances that exist here, I consider collectively all of the circumstances present. And doing so leads me to disagree with the concurring opinion's conclusion that the officers conduct in this case, taken as a whole, "signaled no more than that they wished to talk with [Roberson]," or equates to "ordinary social intercourse." Instead, the officers' conduct was a show of authority.

9

*Id.* at 1138–39 (emphasis added) (citations and footnote omitted).

The *Roberson* concurring and dissenting opinions indicate that the use of takedown lights to illuminate a parked car at night, in the absence of other indicia of police coercion, does not convert a consensual encounter into a seizure. Citing authority from other circuits, the concurring opinion concluded that the use of both takedown lights *and* spotlights, along with temporarily blocking in the parked vehicle, was not coercive enough to effectuate a seizure. Under this reasoning, the use of takedown lights without the additional use of a spotlight would not amount to a seizure. And although the dissenting opinion concluded that the use of takedown lights and spotlights, in combination with the convergence of multiple police vehicles and the temporary obstruction of the parked vehicle's path of exit, amounted to a seizure, Judge Moritz indicated that she did not disagree with authority from other circuits holding that an officer's use of bright lights at night to illuminate a parked vehicle did not effectuate a seizure of the occupants of the vehicle.

In light of the above-cited authority from this circuit and sister circuits, as well as the testimony presented during the evidentiary hearing and the body-cam footage submitted into evidence, the court finds that Tafuna had not been seized by Officer Nelson during their initial encounter. Officer Nelson did not block in the parked vehicle with his police vehicle. He used his takedown lights to illuminate the parked car but did not engage his red and blue flashing lights or use a spotlight, which would be more intimidating. Officer Nelson then approached the driver's side door on foot. His line of approach did not obstruct the parked vehicle's path of exit. Finally, no other officers were in the area. Considering these circumstances, the use of takedown lights did not

amount to a show of force that would communicate to the average person that he or she was being detained and was not free to leave. Thus, the initial encounter was consensual and did not violate Tafuna's Fourth Amendment rights.

### B. The Records Search

After Officer Nelson obtained the names and birthdates of the individuals sitting in the parked vehicle, he told them that he was going to run their names. Officer Nelson then returned to his police vehicle and performed a records search on Tafuna. After retrieving Tafuna's records, Officer Nelson requested the assistance of additional officers, who took 10 to 15 minutes to arrive.

Tafuna argues that Officer Nelson detained him at this point because a reasonable person would not feel free to leave after a police officer states that he is going to run their name and returns to his police vehicle. In other words, Tafuna asserts that Officer Nelson's statement carried an implicit command to stay put until he completed a records search. But the court need not decide whether Tafuna was detained at that point in his encounter with Officer Nelson because, assuming that he had been detained, it would have been justified by reasonable suspicion of criminal activity.

A police officer can briefly detain a suspect to conduct an investigation if the officer has a reasonable, particularized suspicion "that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). "'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . . ." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). But reasonable suspicion must be supported by more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. In conducting a reasonable suspicion

analysis, the court does not look to the subjective intent or state of mind of the detaining officer. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011); *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Instead, the court takes the facts known to the detaining officer and conducts an objective analysis as to whether the reasonable suspicion standard has been satisfied. *See id.*

In this case, Officer Nelson's initial conversation with Tafuna revealed two key facts: he was on parole and he stated that he had a knife. From this information, an officer would reasonably suspect that two additional inferences may be true. First, an officer would reasonably surmise from the fact that Tafuna was on parole that carrying a dangerous weapon may violate his parole or otherwise be illegal. One of the "regular and standard parole conditions" found in Tafuna's parole agreement states: "I will not purchase, possess, own, use, or have under my control any explosive, firearm, ammunition, or *dangerous weapon*, including archery equipment or crossbows." (Emphasis added). The court finds that the average police officer would be aware of such standard conditions in parole agreements and would reasonably be suspicious that Tafuna's parole agreement would likewise contain a weapons provision. Moreover, independent of Tafuna's parole agreement, it is against Utah law for an individual on parole for most felonies to possess a dangerous weapon. UTAH CODE § 76-10-503(1)(a)(ii), (1)(c), (2)(c). Thus, an officer would have known that there was a strong possibility that it was illegal for Tafuna to have a dangerous weapon.

Second, a reasonable officer would suspect that the knife that Tafuna admitted he was carrying could be a dangerous weapon prohibited by either his parole agreement or Utah law. The parole agreement does not provide a precise definition of the term

"dangerous weapon." But the Utah Legislature has defined this term in its criminal code as "an object that in the manner of its use or intended use is capable of causing death or serious bodily injury." UTAH CODE § 76-10-501(6)(a). The Utah Code mandates the consideration of six factors to determine whether an object is dangerous:

> (i) the location and circumstances in which the object was used or possessed;
>
> (ii) the primary purpose for which the object was made;
>
> (iii) the character of the wound, if any, produced by the object's unlawful use;
>
> (iv) the manner in which the object was unlawfully used;
>
> (v) whether the manner in which the object is used or possessed constitutes a potential imminent threat to public safety; and
>
> (vi) the lawful purposes for which the object may be used.

*Id.* § 76-10-501(6)(b). Depending upon its characteristics, a knife may or may not be a dangerous weapon. *Compare Salt Lake City v. Miles*, 342 P.3d 212, 219–20 (Utah 2014) (holding that a pocketknife with a three-and-a-half-inch blade was not a dangerous weapon) *with State v. Archambeau*, 820 P.2d 920, 929 (Utah Ct. App. 1991) (holding that two ten-inch knives with five-to-six-inch blades were dangerous weapons).

In summary, Tafuna confessed that he had a knife. There is no evidence that Tafuna described the knife he had. Nor did he show the knife to Officer Nelson. Given that Officer Nelson was unaware of the particular characteristics of the knife, a reasonable officer would suspect that the knife could have been an illegal dangerous weapon. Officer Nelson had reasonable, particularized suspicion of illegal activity to justify an investigatory detention to confirm or dispel this suspicion. Thus, even

assuming that Officer Nelson detained Tafuna by announcing that he was running his name, this temporary seizure would not violate his Fourth Amendment rights.

### C. Discovery of the Pocketknife

After backup officers arrived, Officer Nelson told Tafuna to exit his vehicle and to walk to Officer Nelson's police vehicle. Officer Nelson performed a pat down of Tafuna and discovered a pocketknife on his person. Officer Nelson then instructed Tafuna to stand next to the police vehicle and aggressively questioned Tafuna about the knife, the contents of his pockets, and what he was doing in the parked vehicle late at night. Tafuna stated that he used the pocketknife to open boxes for his job assembling office furniture. When Tafuna asked why the officers were questioning him, Officer Nelson stated that under the law he had the ability to stop Tafuna to investigate suspicious activity. After the interrogation, Officer Nelson told Tafuna to go stand next to the vehicle in which Tafuna had been sitting.

From a review of the body-cam footage that captured this interaction, there can be no question that Tafuna had been detained by this point of the encounter. Officer Nelson's commands and sharp interrogation amply conveyed the message that Tafuna was not free to leave or otherwise terminate his encounter with the officers. Indeed, Officer Nelson all but stated that Tafuna was detained when Officer Nelson told Tafuna that he had the ability to stop and investigate suspicious activity. Tafuna argues that this detention was not supported by reasonable suspicion because once Officer Nelson discovered the pocketknife, a reasonable police officer would know that it was not a dangerous weapon under Utah law. *See Miles*, 342 P.3d at 219–20 (holding that a

pocketknife with a three-and-a-half-inch blade, which had not been brandished or used to harm anyone, was not a dangerous weapon).

The court, however, need not decide whether the pocketknife was an illegal dangerous weapon because at this point in time, the officers at the scene had an additional justification to hold Tafuna. It is not against Utah law to sit in a vehicle on private property with an open container of alcohol. *See* UTAH CODE § 41-6a-526(3). But before Officer Nelson discovered the pocketknife, Officer Schmidt looked up Tafuna's parole agreement. Thus, Officer Schmidt knew of Tafuna's special condition of parole prohibiting him from possessing, consuming, or having access to alcohol. Because the officers knew that an open beer can was in the center console next to Tafuna, the officers had reasonable and particularized suspicion that Tafuna had violated his parole by drinking or, at least, by having access to alcohol. In fact, when questioned about the beer after the pat down search, Tafuna acknowledged that it was his.

Because Tafuna's post-pat down detention was justified by reasonable suspicion that he had violated the alcohol clause of his parole agreement, the officers did not unconstitutionally seize Tafuna during this portion of the encounter.

### D. Conclusion

The officers did not unconstitutionally seize Tafuna at any point during their interaction with him prior to the discovery of the firearm or Tafuna's confession. Accordingly, there is no basis for excluding the firearm or the confession based upon an unconstitutional seizure of Tafuna's person.

**CONCLUSION**

Tafuna does not have standing to challenge the unconstitutional vehicle search. And he was not unconstitutionally detained. The court, therefore, GRANTS the Government's motion for reconsideration and VACATES its prior order excluding the firearm and confession evidence.

By the court's calculation 57 days have elapsed on the speedy trial clock. The court accordingly sets a trial date in this case for December 18, 2019, which is within the 13 days remaining on the speedy trial clock. If the parties wish to continue the trial, they must file a motion to continue by December 16, 2019 at 3:00 p.m.

DATED December 11, 2019.

BY THE COURT:

_____
JILL N. PARRISH
United States District Court Judge